UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JESSIHA LANCASTER,

    Plaintiff,

v.

HAROLD CLARK, *et al.*,

    Defendants.

Case No. C07-5251 RJB/KLS

REPORT AND RECOMMENDATION

**NOTED FOR:
September 12, 2008**

Before the Court is the motion for summary judgment of Defendants Michelle Alejo, Travis Boren, Ruben Cedeño, Harold Clarke, James Dunivan, Bettyjane Ehrlich, Louie Figueroa, Lisa Kessler, Larry Malcolm, Fred Navarro, Joseph Quenga, Steve Ramsey, Marc Stern, Michael Watkins, and Mark Yeager. (Dkt. # 129). In support of their motion, Defendants submit the Declarations of Kimberly Frinell, Kimberly Kiesz, Dawn Walker, Dr. Marc Stern, Devon Schrum, and Travis Boren; administrative, grievance and medical records relating to Plaintiff, and excerpts of Plaintiff's deposition. (Dkt. # 129-2).

Defendants argue that Plaintiff's claims must be dismissed because Plaintiff failed to allege personal participation as to one or more of the Defendants, cannot establish deliberate indifference, failed to exhaust his administrative remedies, cannot establish cruel and unusual punishment or an

REPORT AND RECOMMENDATION - 1

equal protection violation, and because Defendants are entitled to qualified immunity.

Plaintiff has not responded to Defendants' motion, although he had ample time to file a response.[1] Under Local Rule 7 (b)(2) failure to file papers in opposition to a motion may be deemed by the court as an admission the motion has merit.

After careful review of Defendants' motion, supporting evidence, the balance of the record, and viewing the facts in the light most favorable to the Plaintiff, the undersigned recommends that Defendants are entitled to summary dismissal of the claims against them.

## I. SUMMARY OF BACKGROUND

In this 42 U.S.C. § 1983 action, Mr. Lancaster sues sixteen past or current employees of the Washington State Department of Corrections (DOC). In December 2004, Mr. Lancaster was seen by health care staff at the Stafford Creek Corrections Center (SCCC), where he was diagnosed with mild priapism (where his penis was in a prolonged state of erection) and phimosis (constriction of the orifice of the prepuce (foreskin) so as to prevent the foreskin from being drawn back). He was treated by SCCC health care staff over the next month with medication and compresses for his condition. On January 19, 2005, an SCCC health care provider recommended that Mr. Lancaster be seen by a urologist within two weeks regarding the phimosis. The referral did not take place. Mr. Lancaster was transferred to the Washington Corrections Center (WCC), where he was seen by a nurse on February 27, 2005. She planned a visit for Mr. Lancaster with a practitioner, but that scheduled visit did not occur until seven weeks later because transportation could not be arranged from the IMU. Each time the visit was rescheduled, a practitioner reviewed the medical record on the day of the failed appointment and made a medical determination that postponement was

---

[1] Defendants' motion, filed on May 23, 2008, was originally noted for June 20, 2008. (Dkt. # 129). Plaintiff was given a thirty day extension, until July 21, 2008, to respond. (Dkt. # 135).

REPORT AND RECOMMENDATION - 2

medically appropriate. When Mr. Lancaster was seen by a practitioner on April 27, 2005, the practitioner instituted a care plan and determined that referral to a urologist was not necessary. Mr. Lancaster was then seen regularly by health care staff and was given medication over the course of the next year. In January 2006, a doctor at WCC determined that Mr. Lancaster should be referred to a urologist to evaluate symptoms related to dysuria and hematuria.[2] The urologist noted that Mr. Lancaster may very well suffer from permanent erectile dysfunction and recommended further testing to determine whether it is caused by leukemia.

Mr. Lancaster alleges that Defendants failed to treat his priapism, leaving him in agonizing pain and discomfort and that their delay in referring him to a urologist led to the possibility that he may have permanent erectile dysfunction. He also alleges verbal mistreatment and assault by prison staff during a rectal examination conducted by Dr. Goldenson in October 2005.

## II. FACTS

**A.  Initial Treatment/Diagnosis At Stafford Creek Corrections Center**

On December 23, 2004, Mr. Lancaster was seen in the SCCC IMU medical room by Physician Assistant D. Thompson, PA-C. (Dkt. # 129-2, p. 28[3]). PA-C Thompson diagnosed Mr. Lancaster with mild priapism and phimosis and treated this by prescribing some cream to be applied daily for 30 days and recommending cool compresses. *Id*.

On December 26, 2004, Mr. Lancaster was seen by Registered Nurse J. Fadele, RN2. *Id*., p. 30. RN2 Fadele diagnosed Mr. Lancaster with phimosis and recommended that he continue to move his foreskin back and forth and clean adequately. *Id*.

---

[2] Dysuria, difficult or painful urination; Hematuria, presence of blood or red blood cells in the urine. *Webster's II New Riverside University Dictionary* (1995).

[3] For ease of reference, citations are to CM-ECF pagination. Defendants exhibits can be found at Dkt. # 129-2 and are consecutively numbered 1 through 113.

REPORT AND RECOMMENDATION - 3

On December 28, 2004, Mr. Lancaster was seen by Physician Assistant Louie Figueroa, PA-C, who diagnosed Mr. Lancaster with phimosis and treated Mr. Lancaster by prescribing 500 mg Naproxen and recommending warm compresses. *Id*.

On January 19, 2005, PA-C Figueroa completed a Consultation Request for Mr. Lancaster to see a urologist regarding the phimosis. *Id*., p. 32.

**B.      Medical Treatment Received At Washington Corrections Center**

   **1.      February 2005 and March 2005**

On February 17, 2005, Mr. Lancaster was transferred from SCCC to WCC. (Dkt. # 129-2, pp. 66-70).

On February 25, 2005, Mr. Lancaster was seen in WCC IMU by Physician Assistant R. Amaru, PA-C. *Id*., pp. 35. PA-C Amaru indicated that Mr. Lancaster had an enlarged prepuce and scheduled him to be seen by Dr. Fred Navarro, M.D. on March 3, 2005. *Id*. Mr. Lancaster was unable to make three medical appointments scheduled in March and early April 2005 due to lack of transportation from IMU. *Id*., Exh. 4, p. 83. A practitioner at WCC reviewed Mr. Lancaster's medical record on the day of each failed appointment and each time made a medical determination that postponement was medically appropriate. *Id*. at 83; and pp. 37, 39.

   **2.      April 2005 and May 2005**

On April 27, 2005, Mr. Lancaster was seen at WCC by Dr. Navarro. *Id*., p. 41. Dr. Navarro noted that the balanitis (defined as inflammation of the head of the penis) was resolving, but he noted questions regarding deep seated prostatitis and prescribed Levofloxacin. *Id*.

On May 16, 2005, Mr. Lancaster was seen by Physician Assistant Larry Malcolm, PA-C. *Id*., p. 43. PA-C Malcolm indicated that Mr. Lancaster had a scrotal abscess and continued his prescription for Levofloxacin and scheduled him for an appointment the next morning for possible

REPORT AND RECOMMENDATION - 4

I&D (incision and drainage). *Id*.

On May 17, 2005, Dr. Navarro indicated that Mr. Lancaster had an infected pustule right scrotal sac and ordered discontinuation of Levofloxacin and prescribed Keflex. *Id*.

On May 25, 2005, Dr. Navarro noted that Mr. Lancaster's condition of an infected scrotal cyst was resolved. *Id*., p. 45.

### 3. August 2005

On August 2, 2005, Mr. Lancaster was seen by Nurse Practitioner A. Wedvik, ARNP. *Id*., p. 47. ARNP Wedvik noted that Mr. Lancaster complained about painful urination and lesions on his penis, but refused to be examined by ARNP Wedvik so the visit was terminated. *Id*.

### 4. October 2005 Rectal Examination and Grievance

On October 5, 2005, Mr. Lancaster was seen by Joe Goldenson, M.D. at the request of his attorney Terri Sloyer, Esq., (Dkt. #129-2, p. 49) Dr. Goldenson indicated that Mr. Lancaster's prostate was slightly boggy and tender to palpation (left greater than right). *Id*. Dr. Goldenson's opinion was that a clinician at the facility needed to evaluate and treat Mr. Lancaster for probable prostatitis and refer him to an urologist for further evaluation of his problems. *Id*.

On October 5, 2005, Mr. Lancaster submitted the following grievance:

> The staff misconduct of WCC C/O Mark Yeager, who on 10-5-05 when I was getting examined by Dr. Goldenson suggested over IMU's radios' that my physician us (use) butter to do a rectal examination. The examination of my prostrate while being hand cuffed behind my back with 2 C/O's watching and holding on to a leash-tether connected to my cuff's while I was bent over the segrigation (segregation) review wooden table was in it self extremly [sic] humiliating and degrading. C/O Mark Yeager was extremly (extemely) out of line with no regard for my personal posision (position) and his unprofessional conduct compounded the sichuwasion (situation) of me being humiliated, degraded and subjected to unhuman (inhumane) treatment.
>
> SUGGESTED REMEDY: Have a permanent reprimand placed in C/O Mark Yeager's employee record. This is no the first time he has made sexually and or inapropriat(e) [sic] comments to inmates.

REPORT AND RECOMMENDATION - 5

(Dkt. # 129-2, p. 108). Mr. Lancaster presented this grievance to the third and highest level in which he received a response that concurred with the response he received to his second level grievance which stated:

> Mr. Lancaster, Officer Yeager should have conducted himself more professionally on the IMU radio. Officer Yeager along with all staff in the IMU have been counseled on their radio etiquette and professionalism. Incidents like this should not happen in the future. Thank you for bringing this to my attention.

*Id.*, p. 108.

Defendants submit the declaration of Corrections Officer Travis Boren, who escorted Mr. Lancaster from his cell in the WCC Intensive Management Unit to and from his appointment and provided security during the medical encounter. *Id.*, pp. 11-113. Mr. Boren testifies, that apart from the inappropriate comment by Officer Yeager over the radio, the examination occurred without incident. *Id.*

### 5. Remainder of October 2005

On October 13, 2005, PA-C Malcolm saw Mr. Lancaster. (Dkt. # 129-2, p. 51). PA-C Malcolm indicated that Mr. Lancaster had prostatitis, probable chronic prostatitis, and prescribed Ciprofloxacin. He also ordered several different lab tests and ordered a two week follow-up. *Id.*

On October 31, 2005, PA-C Malcolm saw Mr. Lancaster and indicated that Mr. Lancaster had prostatitis chronic, and scheduled an IVP (Intravenus Pyelogram) to rule out upper urinary tract problem. *Id.*, p. 53.

### 6. November 2005

On November 3, 2005, Mr. Lancaster was seen by R. Bednarczyk, M.D. *Id.*, p. 55. Dr. Bednarczyk indicated that the IVP was completed. He prescribed Flomax and ordered a follow-up after the IVP results are available. *Id.*

On November 29, 2005, Dr. Bednarczyk saw Mr. Lancaster. *Id.*, p. 57. Dr. Bednarczyk

REPORT AND RECOMMENDATION - 6

noted that Mr. Lancaster was still having pain urinating. He ordered a prescription for Cipro to be discontinued after November 30, 2005. He also prescribed Doxycycline and ordered a urinalysis (UA) in January 2006. *Id*.

**7. January 2006**

On January 12, 2006, Dr. Bednarczyk saw Mr. Lancaster. *Id*., p. 59. Dr. Bednarczyk raised Mr. Lancaster's Flomax prescription to maximum dosage and requested a urology consult for hematuria and urinary flow issues. *Id*.

**C. Medical Treatment Received At McNeil Island Corrections Center**

On February 9, 2006, Mr. Lancaster was transferred from WCC to MICC. (Dkt. # 129-2, p. 70). The consult for urology from WCC was approved and on February 14, 2006, Mr. Lancaster was seen by Urologist Michael Ellen, M.D. for evaluation of symptoms of microscopic hematuria and dysuria. *Id*., p. 61. Dr. Ellen stated the following:

> Mr. Lancaster has a very interesting history of prapism which apparently occurred without trauma or drug use. Trazodone is known to cause priapism and I am uncertain if Doxepin[4] can cause the same potential complication. Sources of idiopathic priapism would include sickle cell disease or thalassemia, both are unlikely in this patient. Another potential source could be leukemia. The patient does have symptoms of bladder outflow obstruction and may have urethral stricture disease. The patient may very well have permanent erectile dysfunction although this is not an issue for the patient in his current situation. I have recommended that we work him up further with CT urogram for evaluation of hematuria. I would like to then have him return for cystoscopy. I would like to check CBC to rule out the possibility of leukemia.

*Id*., pp. 61-62.

On February 24, 2006, Mr. Lancaster was seen by Dr. Ellen for follow up of dysuria and hematuria. *Id*., p. 64. Dr. Ellen reviewed the test results and indicated that there is no evidence of

---

[4]In December 2004, when Mr. Lancaster reported symptoms of priapism, he was taking Doxepin for depression. (Dkt. # 129-2, p. 61).

REPORT AND RECOMMENDATION - 7

urethral stricture disease to explain voiding symptoms. *Id*. Dr. Ellen also noted that Mr. Lancaster may well end up with permanent erectile dysfunction," and that this should be addressed once he is released from the correction system. *Id.*

### III.  DISCUSSION

**A.  Failure to Allege Personal Participation of Defendants Alejo, Cedeno Clarke, Dunivan, Ehrlich, Kessler, Malclm, Ramsey, Stern and Watkins**

To obtain relief against a defendant, the plaintiff must prove the particular defendant has caused or personally participated in causing the deprivation of a particular protected constitutional right. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981); *Sherman v. Yakahi*, 549 F.2d 1287, 1290 (9th Cir. 1977). To be liable for "causing" the deprivation of a constitutional right, the particular defendant must commit an affirmative act, or omit to perform an act, which he or she is legally required to do, which causes the plaintiff's deprivation. *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation. *Rizzo v. Goode*, 423 U.S. 362, 370-71, 375-77 (1976); *Leer v. Murphy*, 844 F.2d 628 (9th Cir. 1988). Sweeping conclusory allegations against an official are insufficient to state a claim for relief. The plaintiff must set forth specific facts showing a causal connection between each defendant's actions and the harm allegedly suffered by plaintiff. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980); *Rizzo*, 423 U.S. at 371.

Defendants in a 42 U.S.C. § 1983 action cannot be held liable based on a theory of respondeat superior or vicarious liability. *Polk County v. Dodson*, 454 U.S. 312, 325 (1981); *Bergquist v. County of Cochise*, 806 F.2d 1364, 1369 (9th Cir. 1986). Absent some personal involvement by the defendants in the allegedly unlawful conduct of subordinates, they cannot be

REPORT AND RECOMMENDATION - 8

held liable under § 1983. Johnson, 588 F.2d at 743-44.

Mr. Lancaster fails to allege or demonstrate personal participation in the deprivation of any of his constitutionally protected rights by Defendants Michelle Alejo (a licensed pratical nurse), Ruben Cedeno (the deputy secretary of the DOC), Harold Clarke (the former secretary of the DOC), James Dunivan (a correctional specialist), Bettyjane Ehrlich (an executive secretary), Lisa Kessler (a communications director), Larry Malcolm (referred to as "Larry Malcolmb", a correctional health care specialist), Steve Ramsey (a correctional manager), Marc Stern (the DOC Medical Director), and Michael Watkins (a health care manager). Mr. Lancaster alleges in his Amended Complaint only that they held their respective titles. (Dkt. # 58, pp. 5-7).

In his deposition, Mr. Lancaster testified that he did not know many of the defendants he named or the reason he sued them, apart from the general allegation that they failed to act in light of the office that each held within the DOC, or that their names appeared in written communication pertaining to him. (Dkt. # 129-2, pp. 34-41; Dkt. No. 58, pp. 14, 15, 16, 22, and 23).

These general allegations of respondeat superior liability are insufficient to support Mr. Lancaster's Eighth Amendment claims in this matter. *Johnson*, 588 F.2d at 743-44. Accordingly, the undersigned recommends that his claims against Defendants Alejo, Cedeno Clarke, Dunivan, Ehrlich, Kessler, Malcolm, Ramsey, Stern and Watkins may be dismissed for failure to allege personal participation.

**B.  Plaintiff's Eighth Amendment Claim of Deliberate Indifference to Serious Medical Need**

Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97,

REPORT AND RECOMMENDATION - 9

104 (1976). Deliberate indifference includes denial, delay or intentional interference with a prisoner's medical treatment. *Id*. at 104-5; *see also Broughton v. Cutter Labs*., 622 F.2d 458, 459-60 (9th Cir. 1980). To succeed on a deliberate indifference claim, an inmate must demonstrate that the prison official had a sufficiently culpable state of mind. *Famer v. Brennan*, 511 U.S. 825, 836 (1994). A determination of deliberate indifference involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need. *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992).

First, the alleged deprivation must be, objectively, "sufficiently serious." *Farmer,* 511 U.S. at 834. A "serious medical need" exists if the failure to treat a prisoner's condition would result in further significant injury or the unnecessary and wanton infliction of pain contrary to contemporary standards of decency. *Helling v. McKinney*, 509 U.S. 25, 32-35 (1993); *McGuckin*, 974 F.2d at 1059. Second, the prison official must be deliberately indifferent to the risk of harm to the inmate. *Farmer*, 511 U.S. at 834.

An official is deliberately indifferent to a serious medical need if the official "knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837. Deliberate indifference requires more culpability than ordinary lack of due care for a prisoner's health. *Id.* at 835. In assessing whether the official acted with deliberate indifference, a court's inquiry must focus on what the prison official actually perceived, not what the official should have known. *See Wallis v. Baldwin*, 70 F.3d 1074, 1077 (9th Cir. 1995). In other words an official must (1) be actually aware of facts from which an inference could be drawn that a substantial risk of harm exists, (2) actually draw the inference, but (3) nevertheless disregard the risk to the inmate's health. *Farmer*, 511 U.S. at 837-8.

For purposes of this summary judgment motion, the Court accepts Plaintiff's factual

REPORT AND RECOMMENDATION - 10

statements in his verified amended complaint as true.[5] Mr. Lancaster alleges he has priapism and that Defendants failed to treat this condition and failed to send him to a specialist for treatment for over fourteen months. (Dkt. # 58 at 11). Due to Defendants' conduct, Plaintiff alleges that he has suffered physical pain and mental anguish, which led to his eventual suicide attempt. *Id*., p. 19. Mr. Lancaster also alleges that he cannot have an erection, cannot have sex, or have children. *Id*., pp. 19-20.

There is no dispute related to Mr. Lancaster's diagnoses or that he was referred to a urologist by SCCC staff in January of 2005 and not seen by a urologist until February 2006. Viewing the record in the light most favorable to Plaintiff, however, the undisputed facts fail to show how his damage or pain was proximately caused by any deliberate medical indifference of the Defendants. Plaintiff has presented no competent medical evidence reflecting how the Defendants failed to comply with the standard of care.

Mr. Lancaster's health care record demonstrates that he was seen and treated by numerous providers at SCCC and WCC from the time he first reported his problems with priapism and thereafter throughout the period of time referred to in his amended complaint. Mr. Lancaster was seen in the SCCC health care unit in December when he first complained about the priapism. On December 23, 2004, he was prescribed cream and cool compresses for his complaints of priapism. (Dkt. # 129-2, p. 28). He was seen again by a nurse three days later where he was given additional instruction in which to address his condition. He was also prescribed medication (Naproxen) and he was given warm compresses. *Id*., p. 30. Additional visits occurred in late December 2004 and January 2008 and throughout 2005 after Mr. Lancaster was transferred to WCC. *Id*., pp. 30, 32, 32-

---

[5]Because Mr. Lancaster's verified amended complaint is "based on personal knowledge and sets forth specific facts admissible in evidence, [it] may be considered in opposition to summary judgment. *McElyea v. Babbitt*, 833 F.2d 196, 197-98 & n. 1 (9th Cir. 1987)

REPORT AND RECOMMENDATION - 11

57.

Mr. Lancaster fails to demonstrate that Physician Assistants Louie Figueroa and Larry Malcolm and Dr. Fred Navarro were deliberately indifferent to his medical needs. Physician Assistant Figueroa saw Mr. Lancaster on December 28, 2004 after he was seen by other health care professionals on December 23 and 26, 2004. *Id.*, p. 30. PA-C Figueroa evaluated and treated Mr. Lancaster for phimosis, prescribed Naproxen, recommended warm compresses, and requested the urology consult. *Id.*

Dr. Navarro saw Mr. Lancaster on April 27, 2005, when Dr. Navarro evaluated and treated Mr. Lancaster and prescribed additional medication. (Dkt. # 129-2, p. 41). In mid-May 2005, PA-C Malcolm evaluated Mr. Lancaster's scrotal abscess, continued his prescriptions as given by Dr. Navarro, and set an appointment for Mr. Lancaster to be seen and treated the next day by Dr. Navarro. *Id.*, p. 43. Dr. Navarro saw Mr. Lancaster the next day, evaluated his condition, and changed his medication. *Id*. Dr. Navarro saw Mr. Lancaster the following week on May 25, 2005, and found that Mr. Lancaster's scrotal condition had been resolved. *Id.*, p. 45. Through the rest of 2005, WCC health care staff saw, evaluated, and treated Mr. Lancaster. *Id.*, pp. 47-64. Treatment included additional encounters by PA-C Malcolm in October 2005. *See id.*, pp. 51, 53.

In addition, Mr. Lancaster fails to demonstrate that he had a serious medical need that required him to be seen by a urologist even though it is undisputed that Defendant Figueroa requested such a referral in January 2005 and that referral did not occur. Although a urologist was recommended for Mr. Lancaster prior to his transfer to WCC (Dkt. # 129-2, p. 32), his health care record shows that after he was transferred to WCC, Mr. Lancaster was again examined, and at that time, a health care plan was implemented and it was determined that a referral to a urologist was not needed. *Id.*, p. 41. The reasoning for the change in his health care plan was explained to him in

REPORT AND RECOMMENDATION - 12

response to the grievance filed by Mr. Lancaster on March 13, 2005. The text for the response was provided by Department Medical Director Marc Stern, who evaluated Mr. Lancaster's grievance files and portions of his medical records. *See id.*, pp. 104, 81-72. The Level 3 response stated:

> I reviewed your initial grievance as well as all appeals and responses. The DOC Medical Director also reviewed this matter. You were seen by health care staff at SCCC on 1/19/05 where it was determined that referral to a urologist was needed on an "urgent" basis. You were then transferred to WCC on 2/17/05 and seen by a nurse on 2/27/05. The nurse planned a visit with a practitioner. Apparently the scheduled visits did not take place and were rescheduled three times (3/3, 3/30, and 4/6) as you were in IMU and transportation could not be arranged. You were seen by a doctor on 4/27/05 who evaluated your problems and instituted a care plan. He did not think referral to a urologist was necessary at that point. In retrospect, the problem you had was not urgent and was well handled medically. A practitioner at WCC reviewed the medical record on the day of each of the failed appointments (3/3, 3/30 and 4/6) and each time made a medical determination that postponement was medically okay. You must understand that good doctors can have different opinions about the need for a specialist. It is the judgment of your current doctor that counts the most and that doctor [sic] may come to a different (reasonable) conclusion than his predecessor. Second, from 1/19/05 until 4/27/05, your condition may have improved and a urologist was no longer needed. In conclusion, the Medical Director concurs with the Level II finding and does not support the your request to see a urologist at this time.

(Dkt. # 129-2, p. 104).

In an internal memorandum, Dr. Stern confirms his conclusion that the referral to a urologist was not necessary, but acknowledges that the delays which occurred in Mr. Lancaster's referral process and scheduled visits were not good practice:

> This grievance raises two important system issues. First, an "urgent" consult was generated at SCCC on 1/19 and as of 2/17, 4 weeks later, it had not been executed. This is not good practice. The health care and custody staff at SCCC are aware of the problem and steps to remedy it have already been completed. Second, on 2/27 a nurse at WCC initiated a health care plan that called for the patient to be seen by a practitioner (on 3/3). This plan did not get executed until 7 weeks later (4/27). The reason given was lack of transportation from IMU. Though this is bound to happen from time to time, in general, it is not a good practice.
>
> On the other hand, and fortunately for Mr. Lancaster, I do not believe any harm came to him from these events. In retrospect, the problem he had was not urgent and was well handled medically. A practitioner at WCC reviewed the medical record on the

REPORT AND RECOMMENDATION - 13

day of each of the failed appointments (3/3, 3/30 and 4/6) and each time made a
medical determination that postponement was medically okay.

. (Dkt. # 58-2, p. 40).

More specifically, Mr. Lancaster has provided no competent medical evidence to suggest that the possibility that Mr. Lancaster may suffer from permanent erectile dysfunction is caused by his earlier difficulties with priapism. The record reflects only that Dr. Ellen has recommended testing to rule out leukemia as a potential cause. (Dkt. # 129-2, p. 64).

To establish a constitutional violation, Mr. Lancaster must establish that the Defendants were "deliberately indifferent" to serious threats to his safety. *See Farmer*, 511 U.S. at 834. While the Defendants may arguably have been negligent in their failure to ensure that transportation from IMU did not interfere with Mr. Lancaster's treatment plan, such negligence does not give rise to an abridgement of Mr. Lancaster's constitutional rights. That the possibility that Mr. Lancaster may suffer from permanent erectile dysfunction is not a foreseeable result of the Defendants' failure to immediately refer him to a urologist is particularly true when viewed in light of the fact that Mr. Lancaster was regularly seen by health care providers who did not disregard the risk to Mr. Lancaster's health and who could and did further evaluate whether he was in need of urologist services.

Viewing all the evidence in the light most favorable to Mr. Lancaster, the undersigned finds that Mr. Lancaster has failed to raise a material issue of fact as to whether Defendants were deliberately indifferent to a serious threat to his safety and recommends that summary judgment be granted in favor of Defendants.

**C.      Plaintiff's Eight Amendment Cruel and Unusual Punishment Claims of Assault and Verbal Harassment Against Defendants Boren, Quenga and Yeager**

Mr. Lancaster alleges that during a medical examination performed by Dr. Goldenson

REPORT AND RECOMMENDATION - 14

on October 5, 2005, he was assaulted by Defendant Quenga who "aggressively pushed [him] face down so that [he] was bent over [the] wooden segregation table" and cut his clothing. (Dkt. # 58, p. 21. Mr. Lancaster also alleges that Defendant Yeager made inappropriate comments over the radio that the doctor could use butter off the meal trays as lubricant for the Plaintiff's rectal examination. *Id*., pp. 21-22. After this comment, Plaintiff alleges that he attempted to stand but Defendant Quenga stopped him from doing so and the doctor proceeded with the examination without his consent. Plaintiff alleges that the examination was unprofessional, degrading and humiliating and he felt as though he had been raped. *Id*.

Mr. Lancaster testified that Defendant Quenga had his hand on his left harm, with his body weight over Mr. Lancaster's body and his forearm over the back of Mr. Lancaster's neck. (Dkt. # 129-2, p. 12). Mr. Lancaster testified that he specifically told them "I don't feel comfortable with this. I want to go back to my cell." *Id*., p. 13. Mr. Lancaster testified that he attempted suicide because he suffers from depression, he has been unable to achieve an erection, and he feels that he was raped during the prostrate exam. *Id*.

For the reasons stated below, the undersigned recommends that Defendants be granted summary judgment on Plaintiff's claims against Defendants Boren, Quenga and Yeager. The undisputed record reflects that Mr. Lancaster did not exhaust his administrative remedies regarding his claims of assault during the October 5th medical examination. With regard to Defendant Yeager's inappropriate radio comment, there is no constitutional claim.

**1.    Failure to Exhaust - Plaintiff's Claims Against Defendants Boren and Quenga**

The Prison Litigation Reform Act ("PLRA") requires exhaustion of administrative remedies prior to filing a complaint in federal court. The relevant portion of the PLRA states:

> No action shall be brought with respect to prison conditions under
> section 1983 of this title, or any other Federal law, by a prisoner

REPORT AND RECOMMENDATION - 15

> confined in any jail, prison, or other correctional facility until such
> administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

This requirement "applies to all prisoners seeking redress for prison circumstances or occurrences." *Porter v. Nussle*, 534 U.S. 516, 520 (2002). Further, "[a]ll 'available' remedies" must be exhausted, "[e]ven when the prisoner seeks relief not available in grievance proceedings." *Id.* at 524. Inmates must exhaust prison grievance remedies before filing suit if the grievance system is capable of providing any relief or taking any action in response to the grievance, and must do so in a timely manner. *Booth v. Churner*, 531 U.S. 956, 121 S. Ct. 1819, 1825 (2001); *Woodford v. Ngo*. 548 U.S. 81, 126 S.Ct. 2378, 2386-87 (2006). The purpose of the exhaustion requirement is to "reduce the quantity and improve the quality of prisoner suits; . . . [and] afford corrections officials . . . opportunity to address complaints internally. . . . 42 U.S.C. § 1997e(a). *McKart v. United States*, 395 U.S. 185, 195 (1969).

In deciding whether the PLRA exhaustion standard has been met, it must be remembered that § 1997e(a) is an affirmative defense. *Wyatt v. Terhune*, 315 F.3d 1108, 1119 (9th Cir. 2003). Defendants have the burden of raising and proving the absence of exhaustion. *Id*. There can be no "absence of exhaustion" unless some relief remains "available," and a defendant must demonstrate that pertinent relief remained available, whether at unexhausted levels of the grievance process or through awaiting the results of the relief already granted as a result of that process. *Brown v. Valoff*, 422 F.2d 926, 937 (9th Cir. 2005).

The undisputed record in this case reflects that Mr. Lancaster filed a grievance related to his claim that Defendant Yeager made an inappropriate comment regarding the use of butter as a lubricant, but did not file a grievance related to his claims that Defendants Boren and/or Quenga subjected him to cruel and unusual punishment.

REPORT AND RECOMMENDATION - 16

On October 5, 2005, Mr. Lancaster submitted the following grievance:

> The staff misconduct of WCC C/O Mark Yeager, who on 10-5-05 when I was getting examined by Dr. Goldenson suggested over IMU's radios' that my physician us (use) butter to do a rectal examination. The examination of my prostrate while being hand cuffed behind my back with 2 C/O's watching and holding on to a leash-tether connected to my cuff's while I was bent over the segrigation (segregation) review wooden table was in it self extremly [sic] humiliating and degrading. C/O Mark Yeager was extremly (extemely) out of line with no regard for my personal posision (position) and his unprofessional conduct compounded the sichuwasion (situation) of me being humiliated, degraded and subjected to unhuman (inhumane) treatment.
> SUGGESTED REMEDY: Have a permanent reprimand placed in C/O Mark Yeager's employee record. This is no the first time he has made sexually and or inapropriat(e) [sic] comments to inmates.

(Dkt. # 129-2, p. 108). Mr. Lancaster presented this grievance to the third and highest level in which he received a response that concurred with the response he received to his second level grievance which stated:

> Mr. Lancaster, Officer Yeager should have conducted himself more professionally on the IMU radio. Officer Yeager along with all staff in the IMU have been counseled on their radio etiquette and professionalism. Incidents like this should not happen in the future. Thank you for bringing this to my attention.

*Id.*, p. 108.

Because Mr. Lancaster did not pursue the administrative remedies that were available to him and did not exhaust his remedies regarding his claims that any Defendant assaulted him, this lawsuit has been prematurely filed. Accordingly, the undersigned recommends that Plaintiff's claims against Defendants Boren and Quenga should be dismissed without prejudice.

**2.      Plaintiff's Eighth Amendment Claim - Claims Against Defendant Yeager**

Where the conditions of confinement are challenged, as they are here, a plaintiff must make an "objective" showing that the deprivation was "sufficiently serious" to form the basis for an Eighth Amendment violation. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). Second, the plaintiff

REPORT AND RECOMMENDATION - 17

must make a "subjective" showing that the prison official acted "with a sufficiently culpable state of mind." *Id*. As to the first prong, those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. *Id*. (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety. *See Farmer*, 511 U.S. 825.

Verbal harassment generally does not violate the Eighth Amendment. *Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987) (citations omitted)(directing vulgar language at inmate does not state a constitutional claim); *Keenan v. Hall*, 83 F.3d 1083 (9th Cir. 1996).

There is no dispute that Officer Yeager made the comment about using butter as a medical lubricant over the IMU radio. For purposes of this summary judgment, the Court accepts that the inference can be made that his comment was directed at Mr. Lancaster. While the comment was inappropriate and unprofessional, as recognized by prison officials in counseling Officer Yeager, at most, it is verbal harassment which does not violate the Eighth Amendment.

Therefore, the undersigned recommends that Plaintiff's claims of cruel and unusual punishment against Defendant Yeager be dismissed.

**D.     Fourteenth Amendment Equal Protection Claims**

Plaintiff alleges that Defendants also violated his Fourteenth Amendment right to equal protection under the law when they withheld medical treatment and assaulted him. (Dkt. # 58, pp. 23 and 25). To establish a violation of substantive due process under the Fourteenth Amendment, a plaintiff is ordinarily required to prove that a challenged government action was clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general

REPORT AND RECOMMENDATION - 18

welfare. However, where a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing a plaintiff's claims. *Patel v. Penman*, 103 F.3d 868, 874 (9th Cir. 1996)(citations, internal quotations and brackets omitted); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 841-42 (1998). Here, Plaintiff's challenge to Defendants' conduct has been analyzed by the Court within the context of the protections of the Eighth Amendment. Thus, a more generalized due process analysis is not necessary.

**E.    Qualified Immunity**

As the Court has determined no deprivation of an actual constitutional right as to Plaintiff's Eighth Amendment claims of deliberate medical indifference and conditions of confinement, it need not reach the issue of qualified immunity. *See e.q., Conn v. Gabbert*, 526 U.S. 286, 290 (1999).

### IV. CONCLUSION

For the reasons stated above the Court should **GRANT** the motion for summary judgment of Defendants (Dkt. # 129) be **GRANTED**. A proposed order accompanies this Report and Recommendation.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report and Recommendation to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985). Accommodating the time limit imposed by Rule 72(b), the Clerk of the Court is directed to set the matter for consideration on **September 12, 2009**, as noted in the caption.

REPORT AND RECOMMENDATION - 19

DATED this 20th day of August, 2008.

*Karen L. Strombom*
Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION - 20